# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MEGAN BLAUE**
        **Plaintiff,**

    **v.**                                  **Case No. 05-C-507**

**JO ANNE B. BARNHART**
**Commissioner of the Social Security Administration**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Megan Blaue brings this action seeking judicial review of the denial of her application for disability benefits under the Social Security Act. Plaintiff claimed that she was disabled due to fibromyalgia, depression and anxiety, but her claim was denied initially and on reconsideration, then by an Administrative Law Judge ("ALJ") after a hearing. The Social Security Appeals Council then declined her request for review, making the ALJ's decision the final decision of the Social Security Administration ("SSA") for purposes of judicial review. Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005).

Plaintiff argues that the ALJ committed various errors in evaluating her claim, and asks that the decision be reversed and the matter remanded for another hearing. The Commissioner responds that the ALJ's decision is supported by substantial evidence and free of harmful legal error. The matter has been fully briefed and is ready for decision.

# I. APPLICABLE LEGAL STANDARDS

## A.    Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, she must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The SSA has adopted a sequential five-step test for determining whether a claimant is disabled.  <u>See</u> 20 C.F.R. §§ 404.1520 & 416.920.  Under this test, the ALJ must determine:

(1)    Whether the claimant is performing substantial gainful work;

(2)    If not, whether the claimant has a severe impairment;

(3)    If so, whether the claimant's impairment meets or equals one of the impairments listed in SSA regulations as being presumptively disabling;

(4)    If not, whether the claimant retains the residual functional capacity ("RFC") to  perform her past relevant work; and

(5)    If not, whether the claimant can make the adjustment to other work.

<u>Young v. Barnhart</u>, 362 F.3d 995, 1000 (7th Cir. 2004).

An affirmative answer at any step leads either to the next step, or, at steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that the claimant is not disabled.  The claimant carries the burden of adducing evidence at steps 1-4, but if she reaches step 5, the burden shifts to the SSA to establish that the claimant is capable of performing other

2

work in the national economy.  Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001).  The SSA may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience.  However, the SSA may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, postural, sensory or skin impairments) might substantially reduce the claimant's range of work.  In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision.  Elbert v. Barnhart, 335 F. Supp. 2d 892, 895 (E.D. Wis. 2004).

## B.    Standard of Review of ALJ's Decision

The district court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004).    The ALJ's findings of fact, if supported by substantial evidence, are conclusive.  Id.  Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Cannon v. Apfel, 213 F.3d 970, 974 (7th Cir. 2000).  In determining whether substantial evidence exists, the district court must review the entire record, taking into account both evidence in support of a conclusion and anything that fairly detracts from its weight.  Young v. Sec'y of Health & Human Servs., 957 F.2d 386, 388-89 (7th Cir. 1992).  Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of

3

fact and determine the case accordingly.  See Richardson, 402 U.S. at 399-400.  A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ.  Powers v. Apfel, 207 F.3d 431, 434 (7th Cir. 2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ.  Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings.  Id.  The ALJ commits such an error if she fails to comply with the SSA's regulations and rulings.  Lopez-Navarro v. Barnhart, 207 F. Supp. 2d 870, 878 (E.D. Wis. 2002) (citing Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991)).  The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion.  Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996).  While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning.  Zurawski, 245 F.3d at 889.  Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge between the evidence and the result.  Hodes v. Apfel, 61 F. Supp. 2d 798, 806 (N.D. III. 1999) (citing Sarchet v. Chater, 78 F.3d 305, 307 (1996)).

## II.  EVIDENCE BEFORE THE ALJ

### A.    Testimony

Plaintiff testified that she was twenty-four years old, single, with a twelfth grade education.  (Tr. at 373.)  She stated that she began experiencing severe pain mid-way

through her pregnancy in 2001. The pain continued to get worse after she gave birth and was not relieved after breast reduction surgery. (Tr. at 375-76.) She stated that she continued to have pain in the neck, back and shoulders, at times sharp and at times achy. She stated that the pain was worse with activity (Tr. at 376-77) and that at times her legs became numb (Tr. at 379).

Plaintiff testified that the source of her pain had been diagnosed as fibromyalgia, and that her anxiety contributed to the muscle tension. She also stated that she experienced panic attacks, particularly when in public, during which her heart raced, she became paranoid, and she could avoid passing out only by lying down. (Tr. at 377-78.) Plaintiff testified that she also suffered from depression, which was of long-standing and was not derivative of her physical problems. (Tr. at 386-87.)

Plaintiff stated that the main thing that kept her from working was the pain, which was constant. (Tr. at 379.) She rated the pain a "ten out of ten" during a flare-up, which happened once per month if she was careful, twice per month if she pushed herself. The flare-ups usually lasted three to five days. (Tr. at 385.) She stated that she would not be able to work during these flare-ups. (Tr. at 386.)

Plaintiff testified that she was usually able to take care of her personal needs like bathing and dressing, unless she was having an episode, in which case she would need help. (Tr. at 379.) She stated that she tried to keep up with household chores but could not do repetitive activities like scrubbing, could wash only a few dishes at a time, and needed help with laundry. (Tr. at 379-80.) She stated that she could drive but not for very long without pain. (Tr. at 380.) Plaintiff testified that she could walk around the block a couple of times, sit for about forty-five minutes before she had to get up and move, and

5

needed to lie down about four times per day for about fifteen to twenty minutes. (Tr. at 380.) She stated that she could lift a gallon of milk but not repetitively. (Tr. at 380-81, 389.) She said that her boyfriend usually carried the groceries (Tr. at 389) and that the heaviest thing she lifted around the house was her son, who weighed about thirty pounds, but that it hurt her shoulders (Tr. at 390-91, 396).

Plaintiff's ex-fiancé, Logan Crowl, who had lived with her until a few months before the hearing, testified that plaintiff had down-played the extent of her limitations in her testimony. (Tr. at 394-95.) He stated that she had a harder time with chores than she liked to say. Crowl testified that when he lived with her he did the dishes, took out the garbage, and helped with the laundry. (Tr. at 395.)

The VE , Robert Verkins, testified in response to several hypothetical questions from the ALJ. The first question assumed a person twenty-four years old with a high school education, capable of light work reduced by a requirement that she be able to change from a standing to seated position for a few minutes every hour, with a moderately limited ability to interact with the general public and to work cooperatively with others but who could work in proximity to them, and with a slightly reduced ability to maintain attention and concentration for extended periods. The VE testified that such a person could perform light industrial assembly work (4000 positions in Wisconsin), light production inspection (400 jobs), light machine feeder (800), light hand packager (1100), and sedentary work as a production inspector (500), hand packager (700) and machine feeder (350). (Tr. at 399.) The second question assumed that the same person could not perform repetitive motions with her arms and work around hazards. The VE stated that such a person could not perform any competitive work. (Tr. at 400.) The VE further testified that in the competitive

6

market, employers tolerated not more than one absence per month on average. (Tr. at 400.) So if the person would miss more than three days per month, all competitive work would be eliminated. (Tr. at 401.)[1]

**B.    Medical Evidence**

**1.    Treating Sources**

On June 12, 2001, when plaintiff was about seven months pregnant, she was seen at the Mercy Medical Center complaining of hip and leg pain and an inability to walk. (Tr. at 229.) She was excused from work. (Tr. at 301.) She returned on October 30, 2001, two months post-partum, complaining of upper- and mid-back pain and gastrointestinal problems. She indicated that she had experienced this pain since age sixteen, but it had been aggravated by carrying her child and breast feeding. She was provided with pain medication and advised to use Imodium. (Tr. at 226.)

In January and February 2002, plaintiff was seen by Dr. Tannan, complaining of back and neck pain. The doctor reported that she was crying but refused to try anti-depressants. He prescribed Darvocet. (Tr. at 136.) On February 6, plaintiff underwent an x-ray of the lumbar and cervical spine, which revealed mild to moderate narrowing of the L5-S1 disc space and some straightening of the cervical lordotic curvature. (Tr. at 22; 224-25.) On April 9, plaintiff underwent breast reduction surgery at Mercy, in the hope that it would reduce her back pain. (Tr. at 220.) The operation apparently did not provide satisfactory relief, and plaintiff returned to Dr. Tannan on April 17 requesting Vioxx. (Tr. at 135.)

---

[1]The ALJ concluded that plaintiff had no past relevant work so she did not ask the VE about plaintiff's previous jobs. (Tr. at 398.)

7

In the spring and summer of 2002, plaintiff experienced recurrent nausea and vomiting, and on May 16, 2002, she underwent a biopsy of the rectosigmoid colon, revealing no abnormality. Likewise, a July 31, 2002, stomach biopsy produced negative results. (Tr. at 217-19.)

Plaintiff's back and neck pain continued and on August 5, 2002, she was seen by Dr. Owens, a rheumatologist. (Tr. at 142.) On examination, plaintiff had good range of spinal motion but pain with extremes of movement. She likewise had good range of motion of the shoulders, elbows, wrists and hips. There were some tender points on the upper border of the trapezius and in the forearms. (Tr. at 143.) Dr. Owens's assessment was low back pain, with a possible diagnosis of fibromyalgia, and anxiety. (Tr. at 144.) Plaintiff returned on August 26, and Dr. Owens noted that fibromyalgia seemed to account for a majority of her pain. Dr. Owens advised plaintiff to pursue a sleep and stress management program. (Tr. at 140.)

On November 26, 2002, plaintiff was seen by Dr. Schultz, a physical medicine/rehabilitation specialist, who noted on physical examination that plaintiff had tenderness over most of the tender points described for fibromyalgia. (Tr. at 174-75.) Plaintiff was able to move without significant difficulty and did not have any restrictions in joint or spine range of motion. Plaintiff's chief complaint was neck and shoulder girdle discomfort and to a lesser degree back pain at the lumbo-sacral junction. (Tr. at 175.) Dr. Schulz agreed that the most likely cause of plaintiff's pain was fibromyalgia. However, he

recommended a cervical MRI to rule out other causes.[2]  He also recommended a pain management program, which would include psychological counseling.  (Tr. at 176.)

Between January and May 2003, plaintiff underwent the pain management program at Mercy.  (Tr. at 199-205, 238, 245-60.)  During her intake interview on January 29, plaintiff reported that her symptoms were disabling, her activity tolerance was limited, and that she had difficulty maintaining employment secondary to pain.  She reported co-existing depression, which was stable on medication.  (Tr. at 183.)  The reviewer noted a "moderate level of psychological distress with clinical elevations in the areas of somatic complaints, interpersonal sensitivity, depression, anxiety, hostility, phobic reactions and distrustfulness."  (Tr. at 183.)  Her profile, compared with others with chronic pain, was "in the dysfunctional range.  Compared to other pain patients, her pain severity and life interference are greater."  (Tr. at 184.)  The plan was for plaintiff to undergo physical and occupational therapy, and meet with a psychologist.  (Tr. at 185.)

Plaintiff continued to see Dr. Schultz during the course of the program, and on March 13, they discussed medication dependency issues and agreed that plaintiff would reduce her Hydrocodone usage. (Tr. at 172.)  However, when plaintiff returned to Dr. Schultz on March 27, she related that her condition had deteriorated; she stated that her boyfriend had been arrested after a domestic dispute and that she had to do all of the activities around the house.  Dr. Schultz agreed to temporarily increase her Hydrocodone prescription.  (Tr. at 172.)  Plaintiff returned on April 16 and was not tolerating either

---

[2]A December 12, 2002, x-ray revealed slight spurring posteriorly at the inferior end plate of C6.  (Tr. at 23; 214.)  An MRI completed on the same date revealed mild central disc bulging at C5-6 and C6-7 of doubtful significance.  (Tr. at 24; 215.)

9

Trazodone or Doxepin for sleep disturbance. She was also taking Effexor but did not feel that her depression was controlled, and her sleep was still poor. Plaintiff was at that point close to completing the pain management program, and Dr. Schultz noted that she had significant psycho-social stressors affecting her functional level as well as her pain complaints. (Tr. at 171.)

Plaintiff completed the pain management program, and a final report dated May 14, 2003, indicated that her psychological profile continued to show a moderate level of distress, but with reductions in depression and hostility. (Tr. at 178, 238.) Her pain inventory showed mild improvement in the areas of pain severity and affective distress. Her activity level had increased but was still somewhat lower than the average pain patient. (Tr. at 238.) Her specific functional goals were partially met in a most areas, totally met in a few. (Tr. at 239.) Dr. Schultz's note from May 14 indicated that plaintiff's sleep medication was effective, and that the pain management program had helped a lot. Plaintiff was walking twenty to thirty minutes and exercising three to four days per week. She was continued on Hydrocodone for pain management, and Temazepam and Flexeril for sleep. Emotionally, she was feeling better. Dr. Schultz's plan was to see her once more, then reduce to prn status, with plaintiff's primary physician managing her medication regimen. (Tr. at 241.)

Plaintiff returned to Dr. Schultz on July 15, reporting some ups and downs in her ability to maintain her home exercise program. Her use of medication had been fairly stable. On examination, she had normal strength, good range of motion and tenderness to palpation over the neck and shoulder girdles. Dr. Schultz's impression was fibromyalgia,

with no additional recommendations for treatment. He proposed to see plaintiff in case of exacerbation. (Tr. at 237.)

Plaintiff was seen at Mercy on August 21, complaining of neck pain. She was provided with Flexeril and discharged. (Tr. at 243-44.)

On September 22, plaintiff was seen by Winnebago County Clinical Services, presenting with extreme anxiety related to physical and environmental problems. She had been pulling out her hair, eyelashes and eyebrows, and picking at her face because she was so anxious. She reported a suicide attempt three weeks ago. (Tr. at 265.) On mental status exam, she was depressed and anxious, presenting as somewhat manic in her speech, but she was coherent and insightful about her problems. She had noticeable cigarette burns on her arms and her eyebrows had been pulled out. (Tr. at 266.) The evaluator's assessment was a long-term history of depression, and overwhelming anxiety related to financial problems and her physical symptoms. The evaluator also questioned whether plaintiff was addicted to her pain and sleeping medication, and diagnosed trichotillomania related to her self-harming be behaviors.[3] (Tr. at 266.) Plaintiff was seen by Dr. Zerrien on October 24, and his diagnoses were trichotillomania; probable major depression, mild to moderate; and a history of alcohol and cannabis abuse; with a GAF of

---

[3]Trichotillomania is the compulsion to pull out one's own hair. STEDMAN'S MEDICAL DICTIONARY 1874 (27th ed. 2000).

55.[4]  (Tr. at 268-69.)  Dr. Zerrien modified her medication regimen and suggested psychotherapy.  (Tr. at 269-70.)

In September 2003, plaintiff was also seen by Dr. Dunn complaining of abdominal pain and given Tramadol.  (Tr. at 340.)  She returned to Dr. Dunn on October 10, noted relief of her abdominal problems, but continued back and neck pain.  Dr. Dunn encouraged her to continue to seek counseling and see Dr. Zerrien.  (Tr. at 338.)

Plaintiff was seen by Dr. Norden at the Immediate Care Department on October 11, complaining of increased leg pain.  She was given Ultracet.  (Tr. at 336.)  On October 16, plaintiff returned to Dr. Dunn, complaining of worsening neck and back pain.  Dr. Dunn suggested Neurontin, which plaintiff was to discuss with Dr. Zerrien, and he provided plaintiff with Vicoprofen.  (Tr. at 334-35.)  Plaintiff saw Dr. Dunn on October 24 for a recheck of her back pain, and he provided a refill of Darvocet.  (Tr. at 331-33.)  Plaintiff again saw Dr. Dunn on November 3, complaining of nausea and vomiting, and was provided with a refill of Cyclobenzaprine.  (Tr. at 329-30.)

On November 6, plaintiff was seen by Dr. Boccheciamp complaining of abdominal pain.  The doctor's assessment was acute gastroenteritis versus psychogenic pain.  (Tr. at 327.)  Plaintiff returned to Dr. Boccheciamp on November 11, complaining of shoulder and neck pain and requesting Darvocet.  The doctor's assessment was myalgia, "[p]ossible etiology is musculoskeletal versus psychogenic and drug-seeking behavior."  (Tr. at 325.)

---

[4]"GAF" stands for "Global Assessment of Functioning."  Set up on a 0-100 scale, a score of 50-60 denotes "moderate symptoms," i.e. "moderate difficulty in social, occupational, or school functioning."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32-34 (4th ed. 2000).  A score of 60-70 denotes "mild symptoms." Id.

12

He referred her back to Dr. Schultz for evaluation of her chronic pain and provided samples of Bextra.  (Tr. at 325.)

On December 16, plaintiff saw Dr. Duwell, complaining of insomnia and an exacerbation of her myalgia.  Dr. Duwell agreed with the diagnosis of fibromyalgia, but disagreed with chronic narcotic management.  He refilled her Temazepam and scheduled a revisit in eight to ten weeks.  (Tr. at 320.)  Plaintiff returned on January 15, 2004, experiencing significant aching, especially in her legs, and disturbed sleep.  Dr. Duwell prescribed Cyclobenzapine and Temazepam for sleep, and a temporary supply of Darvocet for pain.  (Tr. at 315.)  Plaintiff returned on March 11 with an exacerbation of pain from the myalgia, and  Dr. Duwell declined to refill Darvocet but did provide more sleep medication. (Tr. at 312.)  Plaintiff visited the walk-in clinic on April 26 complaining of neck pain and headache and was provided with Darvocet.  (Tr. at 308.)  She returned to Dr. Duwell on April 27 and stated that she had received Darvocet from the walk-in clinic.  She related headaches and use of more than eighty Tylenol and Ibuprofen per week.  Dr. Duwell discussed cutting back on analgesics and prescribed Neurontin for headaches.  (Tr. at 310.)

On July 6, 2004, Dr. Eisma completed a questionnaire for plaintiff, in which he stated that he had treated her since May 12, 2004 and that she suffered from fibromyalgia.[5] (Tr. at 17; 302; 351.)  He opined that she often suffered from pain sufficient to interfere with attention and concentration and had a marked limitation in her ability to deal with work stress.  (Tr. at 18-19; 303-04; 352-53.)  He estimated that she could walk one block,

---

[5]The record contains no treatment records from Dr. Eisma.

13

continuously sit for forty-five minutes and stand for five minutes, stand/walk less than two hours in an eight hour day, and sit about two hours in an eight hour day. He further opined that she would need to transition from a seated to a standing position at will and had to lie down at unpredictable intervals. (Tr. at 19-20; 304-05; 353-54.) He stated that she could never lift even less than ten pounds. (Tr. at 20; 305; 354.) Finally, he stated that she would likely be absent from work more than three times per month due to her impairments. (Tr. at 21; 306; 355s.)

### 2. Consulting Sources

Plaintiff's claim was reviewed by several doctors at the behest of the SSA. On December 5, 2002, plaintiff was examined by Dr. Krawiec, a psychologist, who concluded that plaintiff did not have any cognitive impairment and could easily handle simple job instructions. He also concluded that she should have no trouble getting along with co-workers and supervisors, and that she had no significant problems with attention, concentration or memory. Dr. Krawiec found that plaintiff's claims of anxiety and mood disturbance were likely associated with her physical ailments, and that combined with her physical problems could compromise her ability in regard to certain work functions such as sustaining effort. However, he concluded that her anxiety alone would not preclude her ability to handle work functions. His diagnoses were depressive disorder, not otherwise specified, and anxiety disorder, not otherwise specified, with a GAF of 62. (Tr. at 151.)

On June 30, 2003, a state agency consultant completed a physical RFC assessment, opining that plaintiff was capable of medium work (e.g., lifting twenty-five

14

pounds frequently and fifty pounds occasionally),[6] could stand/walk six hours in an eight hour day, sit six hours in an eight hour day, and push/pull in unlimited fashion. (Tr. at 274.) The reviewer found no other limitations, other than on concentrated exposure to hazards. (Tr. at 275-80.) Another reviewer affirmed the report on November 21, 2003. (Tr. at 280.)

Two state agency psychological consultants also reviewed plaintiff's file, finding moderate restrictions of activities of daily living ("ADL's"); mild limitation in social functioning; moderate limitation in concentration, persistent or pace; and no episodes of decompensation. (Tr. at 295.) In a mental RFC assessment, they concluded that plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, maintain attendance and punctuality, complete a normal workday without interruptions from psychologically based symptoms, accept instructions and respond appropriately to supervisors, and respond appropriately to changes in the work setting. They concluded that she was not significantly limited in other areas. (Tr. at 281-82.)

### III. ALJ'S DECISION

Following the five step procedure, the ALJ found that plaintiff was not employed, that she had severe impairments – fibromyalgia, depression, and obsessive compulsive disorder – but that none met or equaled a listed impairment. (Tr. at 35.) The ALJ concluded that plaintiff retained the RFC to perform a wide range of light work, reduced by the need for a sit-stand option, a moderately limited ability to interact with the public and work cooperatively with co-workers, and a slightly reduced ability to maintain attention and concentration for extended periods. (Tr. at 36.) Based on this RFC and relying on the

---

[6]See 20 C.F.R. § 404.1567(c).

VE's testimony and using Grid Rule 202.20 as a framework, the ALJ determined that there were other jobs existing in significant numbers in the national economy that plaintiff could perform.[7]  (Tr. at 36-37.)  Therefore, she found plaintiff not disabled.[8]  (Tr. at 38-39.)

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred in assessing (1) the credibility of her testimony, (2) her RFC, (3) the treating physician reports; and (4) in questioning the VE.

### A.    Credibility

#### 1.    Legal Standard

Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing.  Windus v. Barnhart, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004).  Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong."  Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).  "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." Herron v. Shalala, 19 F.3d 329, 335 (7th Cir. 1994).  Further, the ALJ must comply with SSR 96-7p in evaluating credibility. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003); Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir. 2003).

---

[7]The ALJ determined that plaintiff had no relevant past work and so skipped from step 4 to step 5.  (Tr. at 36; see also Tr. at 75, listing plaintiff's annual incomes.)

[8]Page five of the ALJ's decision is missing from the transcript.  Plaintiff has attached a copy to her brief and labeled it page "35A."

SSR 96-7p establishes a two-step process for evaluating the credibility of the claimant's testimony about symptoms such as pain, fatigue or weakness. <u>Blom v. Barnhart</u>, 363 F. Supp. 2d 1041, 1054 (E.D. Wis. 2005). First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. <u>Id.</u> (citing SSR 96-7p).

Second, if an impairment that could reasonably produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to perform basic work activities. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. <u>Id.</u> (citing SSR 96-7p).

At step two, "the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." <u>Knight v. Chater</u>, 55 F.3d 309, 314 (7th Cir. 1995). Rather, this is but one factor to consider, along with:

    (a) the claimant's daily activities;

    (b) the location, duration, frequency and intensity of the pain;

    (c) precipitating and aggravating factors;

    (d) type, dosage, effectiveness and side effects of medication;

    (e) treatment other than medication;

17

(f) any measures the claimant has used to relieve the pain or other symptoms; and,

(g) functional limitations and restrictions.

Id. (citing 20 C.F.R. § 404.1529(c)(3)); see also SSR 96-7p (stating that ALJ must consider the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms).[9]

While SSR 96-7p and § 404.1529 do not require the ALJ to analyze and elaborate on each of the seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she

_____

[9]The court in Luna v. Shalala, 22 F.3d 687, 691 (7th Cir 1994) summarized the process of pain evaluation as follows:

In evaluating a claimant's subjective complaints of pain, the ALJ must first determine whether the pain alleged is substantiated by objective medical evidence. 20 C.F.R. § 404.1529. If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. [SSR 83-13] She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. SSR 88-13. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. SSR 88-13[.]

18

considered the important evidence and to enable the court to trace the path of her reasoning. Blom, 363 F. Supp. 2d at 1055. In this regard, SSR 96-7p requires the ALJ's decision to include "'specific reasons for the finding on credibility, supported by the evidence in the case record.'" Id. (quoting SSR 96-7p). "Nothing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied. Indeed, the cases make clear that the ALJ must specify the reasons for [her] finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003).

**2.      Analysis**

The ALJ assessed plaintiff's testimony as follows:

The claimant contends that she is unable to perform any work-related activities due to chronic and severe generalized body pain, including neck and back, and anxiety and depression. She testified that the pain is constant, sometimes sharp and sometimes just achy, and is exacerbated by too much activity. She also gets migraines when she has flare-ups of pain. She has anxiety attacks, precipitated by being in public. . . . She also has chronic fatigue and irritable bowel syndrome. However, she testified that she is able to bathe and dress most of the time, performs light housework but no repetitive scrubbing, can do laundry, and drives a vehicle for short periods of time. She estimated she could walk around a block a couple of times, sit for 45 minutes at a time, and lift a gallon of milk. These activities are inconsistent with an inability to perform any work-related activities, and suggest that the claimant can perform a wide range of activities.

Additionally, medical records . . . do not provide a basis for the level of severity alleged by the claimant. With regard to her allegations of chronic pain, objective findings have been minimal. X-rays showed no cervical abnormalities and only mild-to-moderate degenerative lumbar disc disease. Lab tests were also within normal limits, with no evidence of rheumatoid arthritis or other inflammatory process. Physical examinations have consistently revealed no neurological or sensory deficit, full range of motion in all joints and both the cervical and lumbar spine, no swelling, redness or heat in any of the joints, and normal gait and station.

19

The undersigned has also considered the opinions of the treating and examining physicians, and notes that they are rather inconsistent. . . . While it is reasonable to conclude that the claimant suffers from occasional back, neck and joint pain, she should be able to perform the exertional requirements of light work.

The undersigned has also determined that the claimant is less than credible. She has demonstrated drug-seeking behavior on one occasion, and several physicians have indicated that she may have chemical dependency to pain medications. In light of the lack of objective evidence to support her allegations of disabling pain and evidence of drug-seeking behavior, her allegations are not entirely credible.

(Tr. at 35A-36.)

Essentially, the ALJ gave three reasons for her credibility finding: (1) plaintiff's ADL's were inconsistent with her testimony; (2) the objective medical evidence did not support plaintiff's claims; and (3) plaintiff displayed drug-seeking and addictive behavior. None of these reasons withstand scrutiny.

### a. ADL's

It is well-settled that the ability to perform minimal daily activities is not inconsistent with a claim of disability. See, e.g., Zurawski, 245 F.3d at 887; Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000); Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir. 1995); Elbert, 335 F. Supp. 2d at 910-11; Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2005). The ADL's mentioned by the ALJ – bathing and dressing without help (most of the time), light housework (but no repetitive scrubbing), doing laundry, and driving short distances – are properly characterized as minimal. See Zurawski, 245 F.3d at 887 (finding that ADL's of washing dishes, helping children prepare for school, doing laundry, and preparing dinner were minimal); Clifford, 227 F.3d at 870 (characterizing as minimal claimant's performance of two hours of household chores punctuated with rest, cooking of simple meals,

20

vacuuming with pain, and grocery shopping with help); Eback v. Chater, 94 F.3d 410, 413 (8th Cir. 1996) (finding that claimant's activities of "taking care of her personal needs; sharing responsibility with her husband for the care of her 19-month-old child; sharing cooking and house cleaning responsibilities with her husband; frequently driving to visit family members who live 1.5 miles away; and attending bingo on a fairly consistent basis" did not "support the ALJ's conclusion that Eback can do full-time work in the competitive local or national economy"); Hogg, 45 F.3d at 278 ("We have repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."); Harris v. Secretary of DHHS, 959 F.2d 723, 726 (8th Cir. 1992) ("The fact that a claimant . . . cooks, cleans, shops, does laundry, and visits friends does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity."); see also 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").

Further, the ALJ failed to explain how plaintiff's ADL's supported her conclusion. Cf. Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) (affirming denial of claim where ALJ adequately explained how plaintiff's allegations were inconsistent with the record). Instead, the ALJ simply asserted, without analysis, that plaintiff's activities were consistent with the ability to "perform a wide range of activities." (Tr. at 35A.) Thus, she failed to build a bridge from the evidence to her conclusion. See Clifford, 227 F.3d at 872.

Finally, the ALJ's description of plaintiff's activities did not mention the significant qualifications plaintiff included in her testimony. For instance, plaintiff testified as follows:

21

Q    At your house, are you able to take care of your own personal needs like your bathing and dressing?

A    Most of the time, when I have really bad episodes, I've had to have help.

Q    Okay.  What sort of things did you need help with?

A    Drying off and stuff after I get out of the tub and getting into the tub and things like that.

Q    Okay.  Are you able to do household chores?

A    I try, I try to keep up with them.  I'm not very able to wash dishes or do any scrubbing, any repetitive scrubbing really causes the shoulders and neck – flares – I have flare-ups from it if I do it.  And I can do the dishes if I do them like every time there's a few dishes.  I have to do them like a few at a time, I can't do a while load of dishes.  And I usually can do the laundry.  But, I usually have a lot of help.

Q    Okay.  What about driving, can you drive?

A    Yes, not for [a] very long period without a lot of pain.

(Tr. at 379-80.)  Plaintiff further testified that she had to lie down about four times during the day, for about fifteen or twenty minutes.  (Tr. at 380.)  The ALJ did not specifically reject any of this testimony, and it is difficult to see how someone limited to that degree could maintain a full-time position.[10]

### b.    Medical Evidence

Plaintiff's primary physical malady is fibromyalgia.  As the Seventh Circuit has noted, this is:

a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features.  See Frederick Wolfe et al., "The American College of Rheumatology 1990 Criteria for the

---

[10]Crowl testified that plaintiff was even more limited in her ADL's than she was willing to admit.  However, the ALJ failed to mention his testimony.

Classification of Fibromyalgia: Report of the Multicenter Criteria Committee," 33 ARTHRITIS AND RHEUMATISM 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, CURRENT MEDICAL DIAGNOSIS & TREATMENT 1995 708-09 (1995). Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and – the only symptom that discriminates between it and other diseases of a rheumatic character – multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch. [It is difficult to determine the] severity of [the] condition because of the unavailability of objective clinical tests. Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatology)," 310 BRITISH MED. J. 386 (1995); <u>Preston v. Secretary of Health & Human Services</u>, 854 F.2d 815, 818 (6th Cir. 1988) (per curiam), but most do not and the question is whether [the claimant] is one of the minority.

<u>Sarchet</u>, 78 F.3d at 306-07.

In the present case, the ALJ noted that plaintiff's x-rays revealed no cervical abnormalities and only mild lumbar disc degeneration; her lab tests were normal with no evidence of rheumatoid arthritis or other inflammatory process; and physical examinations revealed no neurological or sensory deficit, full range of motion, no swelling, redness or heat in any of the joints, and normal gait and station. However, the ALJ never explained how these findings undermined plaintiff's claim that she suffered from chronic pain due to fibromyalgia. Neither x-rays nor laboratory tests reveal the presence or severity of fibromyalgia. <u>Id.</u> at 306; <u>Alexander v. Barnhart</u>, 287 F. Supp. 2d 944, 966 (E.D. Wis. 2003) (collecting cases rejecting ALJs' reliance on lack of objective medical evidence supporting fibromyalgia claim). The ALJ's mention of joint swelling, redness or heat was likewise

23

irrelevant.  <u>Sarchet</u>, 78 F.3d at 307 ("Since swelling of the joints is not a symptom of fibromyalgia, its absence is no more indicative that the patient's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").

Further, in her discussion of the physical examinations, the ALJ neglected to mention that Dr. Owens, a rheumatologist, and Dr. Schultz, a physical medicine/rehabilitation specialist, both diagnosed plaintiff with fibromyalgia.  (Tr. at 140, 175.)  Specifically, Dr. Schultz noted that plaintiff "had tenderness over most of the tender points described for fibromyalgia as well as a positive skin role in the interscapular region indicative of myofascial adhesions."  (Tr. at 175.)[11]

Because it is a disease of such subjectivity, it is difficult for the ALJ to gage the severity of fibromyalgia.  However, the cases make clear that the ALJ must attempt to do so consistent with SSA procedure.  <u>See</u> <u>Perl v. Barnhart</u>, No. 03-4580, 2005 U.S. Dist. LEXIS 3776, at *9-11 (E.D. Pa. Mar. 10, 2005).  The ALJ may not reject a claim based on the lack of "objective evidence" when such evidence is always unavailable with this disease.

### c.  Drug Seeking and Addictive Behavior

Plaintiff's physicians clearly were concerned about her reliance on pain medication.  (<u>E.g.</u>, Tr. at 172, 320.)  However, aside from one notation of possible "drug-seeking

---

[11]I also note that the ALJ plainly erred in finding that plaintiff had no cervical abnormalities.  An MRI taken on December 12, 2002, revealed disc bulging at C5-6 and C6-7 (Tr. at 215) and an x-ray taken on the same date showed spurring at C6.  As plaintiff concedes, neither of these findings are terribly significant, but they nevertheless demonstrate that the ALJ failed to consider the entire record.

behavior" by a physician at Affinity Medical Clinic (Tr. at 325), and a note from an intake worker for Winnebago County who "wonder[ed] if she isn't also addicted to her pain and sleeping medication" (Tr. at 272), the record contains no support for the conclusion that plaintiff was faking her symptoms in order to get pills to get high. Rather, the records from the physicians who treated plaintiff on a regular basis revealed that she shared her physician's goal of reducing her reliance on opiate analgesics, but that her condition deteriorated when her medication was reduced. (Tr. at 172-73). Dr. Schultz found that plaintiff was "more functional with Hydrocodone" (Tr. at 241) and that her use of medication was "fairly stable" (Tr. at 237). Thus, given the conjectural nature of the evidence of drug-seeking or addictive behavior, compared to the evidence that plaintiff's drug use was necessary and controlled, I cannot conclude that the ALJ's finding on this issue was supported by substantial evidence. Since the factual predicate upon which it was based was unsupported, I must reverse the ALJ's finding that plaintiff's testimony was "not entirely credible" due to "drug-seeking behavior." (Tr. at 36.)

Therefore, for all of these reasons, the ALJ's decision must be reversed and the matter remanded for a re-evaluation of the credibility of plaintiff's testimony.[12]

---

[12]The Commissioner notes that the ALJ also considered the opinions of plaintiff's physicians in evaluating credibility. However, the only opinion the ALJ mentioned in this section of her opinion was Dr. Eisma's, which the ALJ found deserved little weight. (Tr. at 35A.) Further, the ALJ never tied this analysis of Dr. Eisma's opinion to her evaluation of plaintiff's credibility. Thus, it does nothing to bolster the ALJ's credibility determination.

25

**B.    RFC**

**1.    Legal Standard**

RFC is an assessment of the claimant's ability to do sustained work-related physical and mental activities on a regular and continuing basis in spite of her impairments. A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. SSR 96-8p.

In making this assessment, the ALJ must evaluate the claimant's abilities on a "function-by-function" basis. SSR 96-8p. Regarding the claimant's physical capabilities, this means that the ALJ must assess the claimant in terms of seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. "Each function must be considered separately (e.g., 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours'), even if the final RFC assessment will combine activities (e.g., 'walk/stand, lift/carry, push/pull')." SSR 96-8p. Only then may the ALJ express the claimant's RFC in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work. Gotz v. Barnhart, 207 F. Supp. 2d 886, 896 (E.D. Wis. 2002) (citing SSR 96-8p).

Regarding the claimant's mental capacity to work, the RFC assessment requires consideration of an expanded list of work-related abilities that may be affected by mental disorders. Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1035 (E.D. Wis. 2003). The broad factors that the ALJ must consider include the ability to (1) understand, remember and carry out simple instructions; (2) make simple work-related decisions; (3) respond appropriately to supervision, coworkers and customary work pressures in a work setting;

26

and (4) deal with routine changes in work settings.  Id. (citing 20 C.F.R. § 404.1545(c); SSR 96-9p; SSR 85-16; Social Security Program Operations Manual System ("POMS") DI 25020.010A.3.a).  An individual who has suffered a "substantial loss" in the ability to meet any of these work-related demands is considered disabled.  Id. (citing SSR 85-15; POMS DI 25020.010A.3.b).

Finally, the ALJ's decision must describe how she reached her conclusions and how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p.  While the ALJ need not adopt and rely solely on a single medical report in determining RFC, her "decision must 'include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts.'" Samuel v. Barnhart, 316 F. Supp. 2d 768, 772 (E.D. Wis. 2004) (quoting SSR 96-8p).

**2.    Analysis**

In the present case, the ALJ found that plaintiff retained the RFC to perform a wide range of light work,[13] reduced by the need to change positions from standing to sitting for a few minutes in every hour; that she had a moderately limited ability to interact appropriately with the public or to work cooperatively with others but could work in proximity to them; and that she had a slightly reduced ability to maintain attention and concentration for extended periods.  (Tr. at 36.)  However, the manner in which she reached that conclusion was not in compliance with SSR 96-8p.

---

[13]Light work involves lifting up to twenty pounds, ten pounds frequently, and standing/walking six out of eight hours per day. See 20 C.F.R. § 404.1567(b); Samuel, 295 F. Supp. 2d at 944.

27

Regarding plaintiff's physical RFC, the ALJ found that plaintiff could perform a limited range of light work without first assessing the seven strength functions. Neither did she resolve the dispute between the state agency physicians, who opined that plaintiff was capable of medium work (Tr. at 274-80), and Dr. Eisma, who concluded that she could perform only a limited range of sedentary work (Tr. at 17-21). It is true that the ALJ found that Dr. Eisma's report was entitled to little weight, but this did not excuse her from the SSR 96-8p requirement that she support the RFC determination with specific medical facts. The state agency doctors did not support her conclusion, and the ALJ failed to cite any other support in the record for a compromise position.

Regarding plaintiff's mental RFC, the ALJ stated that she was giving "much weight" to the opinions of the consultative examiner, Dr. Krawiec, and the state agency psychologists, but their reports did not fully support her conclusion. Dr. Krawiec opined that plaintiff's anxiety and depression combined with her physical problems could impact her ability to sustain effort, but he found no limitation on her ability to work based on her mental impairments alone. He further concluded that she had no cognitive impairment and could easily handle simple job instructions. (Tr. at 151.) This is inconsistent with the ALJ's finding that plaintiff had a severe mental impairment[14] and her imposition of some mental limitations in the RFC determination. The ALJ included just one of the limitations found by the state agency reviewing psychologists (moderate limitation in interacting with the public and working cooperatively with others) but failed to address their findings that plaintiff was also moderately limited in her ability to maintain attendance and punctuality, complete a

---

[14]See 20 C.F.R. § 404.1521(a) (stating that an impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities).

normal workday without interruptions from psychologically based symptoms, accept instructions and respond appropriately to supervisors, and respond appropriately to changes in the work setting. Further, the ALJ found that plaintiff had just a slightly reduced ability to maintain attention and concentration, while the reviewers opined that this limitation was moderate. Of course, the ALJ need not adopt in full any particular medical report in setting the claimant's RFC. But she must explain how the evidence supports her conclusion and why she has rejected medical evidence suggesting a different result. This the ALJ failed to do.[15]

## C. Treating Source Report

### 1. Legal Standard

Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to special consideration in social security cases. Dominguese v. Massanari, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001). However, this does not mean that the claimant is entitled to disability benefits simply because her physician states that she is "disabled" or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has noted that the claimant's "regular physician may want to do a favor for a friend and client [and] may too quickly find disability." Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985).

---

[15]Plaintiff also faults the ALJ for failing to specifically mention the reports of Drs. Zerrien and Henke. However, the ALJ need not provide a "complete written evaluation of every piece of testimony and evidence." See Haynes, 416 F.3d at 626 (internal quote marks omitted). Further, the ALJ did mention much of the information contained in Dr. Zerrien's notes, including the GAF of 55. (Tr. at 35 ¶ 1.)

Case 2:05-cv-00507-LA   Filed 10/18/05   Page 29 of 34   Document 18

A treating source opinion is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence. 20 C.F.R. §404.1527(d)(2). If the ALJ decides that these criteria are not met, she must determine what other weight, if any, to give the treating source report based on the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d); see also SSR 96-2p. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." Wates v. Barnhart, 274 F. Supp. 2d 1024, 1034 (E.D. Wis. 2003) (quoting 20 C.F.R. § 404.1527(d)(2)). Finally, in some cases the ALJ may be required to re-contact the treating source if the report contains insufficient information for the ALJ to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e); SSR 96-5p.

### 2. Analysis

In the present case, the ALJ stated:

The undersigned has also considered the opinions of the treating and examining physicians, and notes that they are rather inconsistent. Until the recent July, 2004 report of Dr. Eisma and a brief period in 2001 while the claimant was pregnant, no treating physician has suggested that the claimant is disabled. Little weight is afforded the opinions of Dr. Eisma because, at the time he issued the report, he had only been treating the claimant for three months. Additionally, his own records do not provide a basis for the severity of his limitations, in that there is no record of treatment, progress notes, etc. As stated above, objective findings have been minimal, and there

is no evidence that Dr. Eisma relied upon objective clinical and diagnostic findings for his extreme limitations.

(Tr. at 35A.)

Plaintiff faults the ALJ for not explaining why the reports were "inconsistent" or comparing and contrasting the various treating source records. However, it is plain enough from the decision that the ALJ considered Dr. Eisma's report – the only treating source report offering specific restrictions and an opinion on disability – to be inconsistent with the other reports and evidence of record. While the decision could have been clearer on this point, the ALJ need only "articulate, at some minimum level, her analysis of the evidence." Dixon, 270 F.3d at 1176.

In evaluating Dr. Eisma's report, the ALJ considered several relevant factors under 20 C.F.R. § 404.1527(d), including the short-term treating relationship and the absence of treatment notes or other objective findings supporting the report. However, plaintiff notes that the ALJ made the latter finding without first re-contacting Dr. Eisma for clarification. As the Seventh Circuit recently stated:

> An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable. 20 C.F.R. § 404.1527(c)(3); see also S.S.R. 96-2p at 4 ("In some instances, additional development required by a case--for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings--may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record."); Smith v. Apfel, 231 F.3d 433, 437-38 (7th Cir. 2000) (finding that the ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating doctor's opinion controlling weight on that basis); Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."). Further, although a medical opinion

31

on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary.  S.S.R. 96-5p at 2.

Barnett v. Barnhart, 381 F.3d 664, 669-70 (7th Cir. 2004).  In the present case, it would have been simple enough for the ALJ to obtain Dr. Eisma's treatment records in order to determine whether his opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques."  I appreciate the Commissioner's argument that the ALJ had before her a great deal of other treating source evidence, which may well have been inconsistent with Dr. Eisma's report, but given the importance of treating source reports, the fact that this report alone offered specific limitations and an opinion on disability, and the relative ease with which the ALJ could have developed the record, I conclude that the matter should be remanded for this reason as well.[16]

**D.    Hypothetical Question**

   **1.    Legal Standard**

   While the ALJ's hypothetical question to the VE need not include every limitation asserted by the claimant, it must incorporate all of the limitations that are supported by the medical evidence in the record.  See, e.g., Indoranto v. Barnhart, 374 F.3d 470, 474 (7th Cir. 2004); Ehrhart v. Secretary of HHS, 969 F.2d 534, 540 (7th Cir. 1992).  If the VE had the opportunity to learn of the claimant's limitations through an independent review of the medical records or through other questioning at the hearing the court may overlook an

---

[16]Plaintiff faults the ALJ for not specifically considering the other treating source reports.  However, the ALJ mentioned much of this evidence in the body of her decision, and plaintiff fails to point to any specific omission affecting the ALJ's conclusion.  The ALJ accepted that plaintiff suffered from fibromyalgia, as diagnosed by Drs. Owens and Schultz.  On remand, plaintiff may stress to the ALJ those portions of the medical record she believes support her claim.

omission in the hypothetical question. <u>Young</u>, 362 F.3d at 1003. However, in the absence of evidence that the VE independently learned of the claimant's limitations, if "the hypothetical question is fundamentally flawed because it is limited to the facts presented in the question and does not include all of the limitations supported by medical evidence in the record, the decision of the ALJ that a claimant can adjust to other work in the economy cannot stand." <u>Id.</u> at 1005.

### 2. Analysis

In the present case, plaintiff argues that the hypothetical was flawed because it omitted several of the mental limitations found by the state agency reviewing psychologists.[17] However, this pre-supposes that those limitations exist. On remand, the ALJ will have to revisit the issue of plaintiff's RFC and include in her hypothetical questions any limitations supported by the evidence.

Finally, plaintiff argues that the ALJ failed to confirm that the VE's opinions were consistent with the Dictionary of Occupational Titles ("DOT"). The argument has been waived. Although the ALJ has a duty to question a VE about any inconsistencies with the DOT and resolve that conflict before relying on the VE's testimony, SSR 00-4p, counsel has the duty to raise the issue if the ALJ does not, <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446-47 (7th Cir. 2002). In the present case, plaintiff's counsel did not raise the issue at the hearing before the ALJ. Further, plaintiff does not in this court point to any discrepancies between the VE's testimony and the DOT. Therefore, even if the ALJ did err and the issue has not been waived, plaintiff has failed to demonstrate that the error was harmful. <u>See</u>

---

[17]Because the ALJ forbid the VE to review the medical evidence, he could not have otherwise learned of these limitations. (Tr. at 398.)

33

Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

## V.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision, pursuant to § 405(g), sentence four.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 18th day of October, 2005.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge